## Johnston, Appellant, *v.* Pennsylvania Railroad Company et al.

Argued October 19, 1938.

Before KELLER, P. J., CUNNINGHAM, BALDRIGE, STADTFELD, PARKER and RHODES, JJ.

*Herbert Welty,* with him *Fred C. Gartner,* for appellant.

*Theodore Voorhees,* with him *Barnes, Biddle & Myers* and *Leslie C. Krusen* of *Krusen, Evans & Shaw,* for appellee.

OPINION BY RHODES, J., March 3, 1939:

Plaintiff instituted this action in trespass against defendant railroad company to recover damages for the death of her son. The McCormick Steamship Company was brought upon the record as an additional defendant, and at the conclusion of the trial binding instructions were given in its favor. The jury rendered a verdict for plaintiff against the railroad company; its motion for judgment n. o. v. was granted; plaintiff has appealed, assigning as error the granting of this motion.

The court below held that the evidence showed as a matter of law that appellee was not negligent and that deceased was contributorily negligent. In determining the validity of appellant's assignment we are required to apply the familiar rule that the testimony must not only be viewed in a light most favorable to her, all conflicts therein being resolved in her favor, but she must also be given the benefit of every fact and inference of fact pertaining to the issues involved which may reasonably be deduced from the evidence. *Muehlhof v. Reading Company,* 309 Pa. 17, 162 A. 827.

Appellee is the owner of Pier 56, South Wharves, which extends eastwardly from Delaware Avenue in the City of Philadelphia into the Delaware River. The photographs in evidence indicate that it is the usual type of water front structure, consisting of a platform extending out over the water enclosed by four walls and a roof. It is more than 400 feet long. Forming a part of the south wall is a series of sliding doors. Along the south wall of the pier, and at the same level as the floor, a platform about 3 or 4 feet wide extends from the land or west end of the pier to a point about 100 feet from the river end of the pier. At that point there was an offset so that the platform continued with a much narrower width to the river end of the pier. From the photographs it would appear that beyond the offset the platform consisted of a single plank less than half the width of the other portion of the platform. Also beginning at the offset but at a lower level was another line of planking, which also extended to the river end of the pier, much narrower than the platform west of the offset.

On March 5, 1934, at about 10:15 P. M., the McCormick steamship "West Cape" arrived at the pier, and was docked bow in toward the land with its starboard side against the south side of the pier. A gangplank was lowered from the starboard side of the vessel about midships to the 3 or 4-foot wide platform, and as

soon as it was landed deceased, preceded by one companion named Marceaux and followed by two others, went ashore. Arriving on the platform they turned right and walked toward the river end of the pier, in which direction they saw light coming through an open door, about 40 to 50 feet from the gangplank. The opening through which the light was coming was estimated to be between 1½ feet and 3 feet, and was 4 or 5 feet beyond the point where the platform narrowed. The only other light was on the gangplank which illuminated a space of about 20 feet on either side of it. Beyond that it was dark for approximately one-half of the distance, or a little more, between the gangplank and the open door. In walking toward the opening they passed one or two doors which were closed, and appellant's witnesses were unable to state whether any one of their party attempted to open them. Marceaux saw the offset and shouted a warning. However, his shadow had prevented deceased from seeing it, and he fell off the platform just as the warning was uttered, and was drowned.

One of appellant's witnesses testified that, although it was dark beyond the limit of the light shed by the illumination at the gangplank, he could see the outline of the platform over the water. As conditions existed when they arrived on the platform, the opening referred to appeared to be the only way to shore. The platform was closed at the land end of the pier by a fence. There were no lighting facilities on the outside of the pier.

Appellant's evidence fails to show that appellee had any employees on the pier at the time this accident occurred. It appears that the lines were made fast by employees of an independent mooring company under contract with the steamship company. In addition to them, the only other person on the pier, identified by the evidence, was a watchman, employed by the steamship company, who testified for appellee. He did not know who opened the door near the offset, but he had lit all the lights inside the pier that he "was supposed to have

lit," one at each end of the pier and one in the center.

The steamship company was using the pier pursuant to an agreement between it and appellee, dated January 12, 1932, the material portions of which appear in the margin.[1]

---

[1] "1. Effective January 15, 1932, the Pennsylvania Railroad Company hereby grants permission to the McCormick Steamship Company, in conjunction with the use thereof by the Pennsylvania Railroad Company and such other steamship lines as from time to time may be granted the use of the said pier, to use Pier 56, South Delaware Wharves for the purpose of conducting its steamship business at the Port of Philadelphia.

"2. No portion of the pier is to be used for storage except by special permission from the Superintendent of the Philadelphia Terminal Division and any and all revenue from such storage shall accrue to the Railroad Company. On freight stored on the pier, the McCormick Steamship Company hereby agrees to assess and collect storage charges and remit amounts so collected to the Railroad Company and directed by the said Superintendent of the Philadelphia Terminal Division.

"3. Lighters and car floats may deliver or receive freight alongside steamships docked at the pier provided the same facilities are accorded the Pennsylvania Railroad at the piers of the other railroads at the Port of Philadelphia, but it is understood and agreed that the said lighter and car float service will be used to a very limited extent and only where absolutely necessary in connection with the conduct of its business by the McCormick Steamship Company and will not be used to the detriment of the Pennsylvania Railroad from a competitive standpoint.

"4. The Railroad Company reserves the right to at any time use the pier for docking vessels of other steamship companies provided they do not interfere with the proper handling and working of the McCormick Steamship Company.

"5. The Railroad Company will at its own expense make all repairs and do the dredging in the dock at Pier 56.

"6. The Railroad Company will at its own expense insure the pier, pier superstructure, etc.

"7. The McCormick Steamship Company will assume all cost for the necessary lighting, including the renewal and replacement of electric light bulbs, heating and policing on the pier.

"8. For supplying water to vessels through the water lines of the Railroad Company on the pier, a charge of $10 will be assessed for water supplied to each vessel or, if you prefer to

Appellant contends that the entry of judgment for defendant notwithstanding the verdict was error because "the Pennsylvania Railroad Company, which admitted that it owned, controlled, managed and maintained the pier, owed certain duties to Johnston, who was an invitee on the premises, which it disregarded and neglected, viz., that it failed and neglected to properly and adequately light the outside of the pier so that the condition of the footwalk could be observed and avoided; in that it failed to place guard rails or warnings of any kind at or near the end of the footwalk; in that it negligently opened, or permitted to be opened, the third door from the land end of the pier when it knew, or should have known that this door was beyond the end of the footwalk, and in that it failed and neglected to open the first or second door from the land end of the pier, through which these men could have safely proceeded."

While it is undisputed that appellee owned the pier, there is no evidence that it controlled, managed, and maintained it to the extent argued by appellant. Paragraph 4 of her statement of claim reads as follows: "4. In the conducting of its said business, the defendant corporation owned, maintained, operated and controlled a certain wharf or pier in the City and County of Philadelphia, State of Pennsylvania, known as Pier No. 56, South Wharves, which pier extended from Delaware Avenue in the City of Philadelphia, into the Delaware River." At the beginning of the trial the court admitted that paragraph in evidence over appellee's objection, because it had filed no affidavit of defense, but later,

pay for the water on the basis of the amount taken, we will arrange for the installation of a meter and bill you for water supplied to vessels at a rate to be agreed upon, the rate of course to be sufficient to cover the cost of the water, and the maintenance of the meter, water lines, etc.

"9. It is understood and agreed that this arrangement may be terminated by either party on ninety (90) days' written notice to the other."

on motion of appellee's counsel, the court struck out the admission of everything but ownership. To this ruling appellant took no exception, nor is it assigned as error here. Consequently, whatever duties appellee owed to deceased must arise from its ownership of the pier, and the agreement with the steamship company for its use by the latter.

Reference is made in the briefs on both sides to the status of deceased, but we agree with the court below that it makes no difference, under the facts of this case, whether he was a licensee or a business visitor. See Restatement, Torts, vol. 2, §342, quoted in *Musto v. Lehigh Valley Railroad,* 327 Pa. 35, 39, 192 A. 888, 890; Restatement, Torts, vol. 2, §343; *Vetter v. Great Atlantic & Pacific Tea Co.,* 322 Pa. 449, 185 A. 613; *Weir v. Bond Clothes, Inc.,* 131 Pa. Superior Ct. 54, 198 A. 896. Under either view appellant cannot prevail.

The burden was on appellant not only to establish the negligence of appellee by competent evidence, but to show that it was the cause of the death of her son. *Kepner v. Harrisburg Traction Co.,* 183 Pa. 24, 30, 38 A. 416; *Rose v. Adelphia Hotel,* 300 Pa. 1, 4, 149 A. 644; see Restatement, Torts, vol. 2, §430.

It is fundamental that "to establish negligence, it must appear that some duty has been unperformed, and without the violation of the duty there can be no negligence": *Fitzpatrick v. Penfield,* 267 Pa. 564, at page 569, 109 A. 653, at page 655. Ownership of the pier did not charge appellee with the duty to have it prepared at all times for the mooring of vessels, nor did it assume such burden under its agreement with the steamship company. As a matter of fact, the mooring was handled by the employees of an independent agent employed by the steamship company, and an employee of the steamship company was the only one on the pier and in charge of it at the time. Appellant merely furnished the pier for the unloading of the vessel of the steamship company; it had nothing to do with the mooring of the

vessel; and it was not responsible for the failure to open the proper door for deceased to enter the pier. Cf. *Dively v. Penn-Pittsburgh Corp. et al.,* 332 Pa. 65, 2 A. 2d 831.

There is no proof that the platform in question was intended to be used, or was used, as a footwalk in the manner in which deceased was using it at the time of his fatal accident. Cf. *John v. Reick-McJunkin Dairy Co.,* 281 Pa. 543, pp. 546, 547, 127 A. 143. It is admitted that the offset was not a defective condition; there is no evidence that its construction was unusual (see *Coxey v. Guala et al.,* 112 Pa. Superior Ct. 460, 171 A. 484), unnecessary to the operation of the pier, or constituted an unusual danger under ordinary circumstances (see *Hagan v. Delaware River Steel Co.,* 240 Pa. 222, 87 A. 574). The purpose of the platform was to provide a place for landing the gangplank and the transfer of cargo. For such use it was not intrinsically dangerous. See *Siegler v. Mellinger,* 203 Pa. 256, 52 A. 175. It appears that the varying width and height of the platform was necessary in order to unload vessels of different types and tonnages.

The photographs and the testimony clearly indicate that there were at least two doors leading into the pier from the platform where the vessel was moored, and appellee could not reasonably be expected to anticipate that deceased would attempt to enter the pier by the open door beyond the offset. Hence it was not required to furnish lighting facilities on the outside of the pier to facilitate entry to the pier by that route, or to erect a barrier to prevent it.

It is argued that the combination of the open door and the offset created a trap. If so, it was not of appellee's making. The evidence does not disclose the identity of the person who opened the door, but the only persons on the pier at the time were the steamship company's watchman, who turned on the lights inside the pier, and the employees of the mooring concern. Nothing

in the record demonstrates that appellee could or did have anything to do with it. There was no attempt to prove circumstances that would charge appellee with knowledge of the condition. Appellee cannot be charged with negligence because it failed to anticipate an unforeseen or unusual combination of circumstances or occurrences. *Gerdes v. Booth & Flinn, Ltd.*, 300 Pa. 586, 589, 150 A. 483.

In our opinion, the evidence, as a matter of law, portrays a structure that was safe when used in the way it was intended to be used, with no fault in construction or in such maintenance as it was appellee's duty to provide. Appellee was not obliged to take precaution against an unusual and negligent use of it by deceased. *Cochran v. Pennsylvania Railroad Co.*, 244 Pa. 307, 90 A. 654.

While we affirm the judgment of the court below solely on the ground that appellant failed to prove that appellee was negligent, we are constrained to say that the haste of deceased and his companions to go ashore as soon as the gangplank was landed appears from the evidence to have been a large factor in the ensuing tragedy. There is reasonable ground upon which to assume that, had deceased used restraint for but a few moments, the proper doors would have been opened and the necessary lights rigged on the vessel, and he would have safely reached shore.

Judgment is affirmed.